AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>(1) Motorla Cellular Phone, Serial No. ZY2228HVPJ,<br>IMEI: 9900-0624-0926-948 | Case No. |

**FILED**
MAR 22 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

## APPLICATION FOR A SEARCH WARRANT    19MJ1208

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated herein)

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 952, 960, and 963; 21 U.S.C. Sec. 843(b); 18 U.S.C. Sec. 2 | Importation of Methamphetamine; Conspiracy to Import Methamphetamine; Unlawful Use of a Communication Facility; Aiding and Abetting |

The application is based on these facts:

See attached Affidavit (incorporated herein)

☑ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: ___) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ryan A. Hill, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3-22-19

*Judge's signature*

City and state: San Diego, California    Hon. Nita L. Stormes, United States Magistrate Judge
*Printed name and title*

# **ATTACHMENT A**

## PROPERTY TO BE SEARCHED

The following property is to be searched in connection with an investigation of violation of Title 21, United States Code, Sections 952, 960, and 963 (Unlawful Importation of a Controlled Substance and Conspiracy to do the Same), Title 18, United States Code, Section 2 (Aiding and Abetting Unlawful Importation a Controlled Substance), and Title 21, United States Code, Section 843(b) (Unlawful Use of a Communication Facility):

> Motorola Cellular Phone,
> Serial No. ZY2228HVPJ,
> IMEI: 9900-0624-0926-948
> (the **Target Device**)

The **Target Device** is currently in the possession of the Department of Homeland Security, Customs and Border Protection as evidence and being held in the Otay Mesa Vault, located at 9495 Customhouse Plaza in San Diego, California.

## ATTACHMENT B

Authorization to search the **Target Device**, described in Attachment A, includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below. The seizure and search of the **Target Device** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of August 1, 2018 to January 23, 2019:

a. tending to indicate efforts to import methamphetamine, or other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963 (Unlawful Importation of a Controlled Substance and Conspiracy to do the Same), Title 18, United States Code, Section 2 (Aiding and Abetting Unlawful Importation a Controlled Substance), and Title 21, United States Code, Section 843(b) (Unlawful Use of a Communication Facility).

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>(1) Motorola Cellular Phone, Serial No. ZY2228HVPJ, IMEI: 9900-0624-0926-948 | **AFFIDAVIT OF SPECIAL AGENT RYAN HILL IN SUPPORT OF A SEARCH WARRANT** |

I, Special Agent Ryan Hill, having been duly sworn, declare and state as follows:

## I.
## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic devices:

> Motorola Cellular Phone,
> Serial No. ZY2228HVPJ,
> IMEI: 9900-0624-0926-948
> (the **Target Device**)

and seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance (and Conspiracy to do the same); Title 18, United States Code, Section 2, Aiding and Abetting the Unlawful Importation of a Controlled Substance; and Title 21, United States Code, Section 843(b), Unlawful Use of a Communication Facility (the Target Offenses).

2. The **Target Device** was seized from Defendant David Sanchez-Cordero (Defendant) at the time of his arrest for Importation of Methamphetamine on January 23, 2019, at the Otay Mesa Port of Entry. The **Target Device** is currently stored in Customs

and Border Protection's Otay Mesa Vault, located at 9495 Customhouse Plaza in San Diego, California.

3. This search of the **Target Device** supports an investigation and prosecution of Defendant for the Target Offenses. Based on the information below, there is probable cause to believe that a search of the **Target Device**, as described in Attachment A will produce evidence of the Target Offenses, as described in Attachment B.

4. The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offenses. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

## II

## AFFIANT'S EXPERIENCE AND TRAINING

5. I am a Special Agent (SA) of the United States Department of Homeland Security (DHS), Homeland Security Investigations (HSI) and have been so employed since October, 2009. I am a graduate of a twenty-one week preparatory course at the Federal Law Enforcement Training Center. I have received training in investigating various narcotics-related offenses, including the importation of narcotics and narcotics trafficking. I have also had training in the methods used by controlled substance traffickers to import and distribute drugs and to operate detailed distribution networks. My training has also included the use of cellular and digital telephones and other electronic devices used by narcotics traffickers in the normal course of their illicit activities. Since becoming a HSI SA, I have been involved in over 150 narcotics trafficking investigations involving the

2

1  importation, distribution and sale of large quantities of controlled substances. I have also
2  worked with other agents with extensive experience in narcotics smuggling investigations.

3     6.    I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C)
4  of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make
5  applications for search and seizure warrants. I am authorized to investigate violations of
6  laws of the United States and to execute warrants issued under the authority of the United
7  States.

8     7.    Since April 2010, I have been assigned to Operation Alliance at San Ysidro,
9  California, and as such am cross-designated by the U.S. Drug Enforcement Administration
10 (DEA) to conduct narcotics investigations and enforce the provisions of the Federal
11 Controlled Substance Act, otherwise known as Title 21, of the United States Code. My
12 assignment includes investigations related to the illegal importation and trafficking of
13 narcotics. In the course of my duties, I have worked as the case agent, directing specific
14 drug-related investigations; I have worked as a surveillance agent and observed and
15 recorded movements of individuals trafficking in drugs and of those suspected of
16 trafficking in drugs; I have participated in the execution of numerous search warrants; I
17 have initiated and executed numerous arrests for drug-related offenses, including
18 possession with the intent to distribute and the importation of controlled substances; and, I
19 have interviewed defendants, witnesses and informants relative to the illegal trafficking of
20 controlled substances. Through my observations and these interviews, I have gained a
21 working knowledge and insight into the normal operational habits of narcotics smugglers,
22 with particular emphasis on those who attempt to import narcotics into the United States
23 from Mexico at the San Diego international ports of entry.

24     8.    Through the course of my training, investigations, and conversations with
25 other law enforcement personnel, I have learned that it is a common practice for narcotics
26 smugglers to work in concert with other individuals and to do so by utilizing cellular
27 telephones to maintain communications with co-conspirators in order to further their
28 criminal activities. This is particularly true in cases involving distributional quantities of

3

hard narcotics, such as methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on where and when to deliver the controlled substances.

9. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a. Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b. Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c. Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d. Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e. Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g. The use of cellular telephones by conspirators or drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

10. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data

4

includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training, education, and experience investigating these conspiracies, I have learned that searches of cellular/mobile telephones yields evidence:

    a. tending to indicate efforts to import methamphetamine, or other federally controlled substances from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

    e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

## STATEMENT OF PROBABLE CAUSE

### A. DEFENDANTS' ARREST

12. On January 23, 2019, at approximately 12:45 p.m., Defendant David Sanchez-Cordero applied for entry to the United States via vehicle lane 9 at the Otay Mesa Port of Entry in San Diego, California. At the time, Defendant was driving a green Chevrolet Cruze bearing Mexican license plate 474NUP7.

13. Customs and Border Protection Officer (CBPO) Drivdahl was conducting pre-primary roving operations with his human-narcotics detection dog (HNDD) during this time. As CBPO Drivdahl's HNDD screened Defendant's Chevrolet Cruze, it alerted then indicated near the front, passenger-side door. CBPO Drivdahl notified CBPO Ibarra of the dog's alert.

14. CBPO Ibarra contacted Defendant. Defendant said he had nothing to declare and claimed to be going to Jack in the Box in Otay Mesa. Defendant also said he owned the Chevrolet Cruze. As CBPO Ibarra spoke with Defendant, he noticed Defendant was fidgeting and looking around. In other words, he appeared nervous. Defendant was then removed from the Chevrolet Cruze and escorted to the security office while CBPO Ibarra drove the vehicle through the Z-Portal X-ray machine and then to the secondary inspection lot.

15. After CBPO Ibarra drove the Chevrolet Cruze through the Z-Portal machine, CBPO Lee reviewed the images and observed anomalies within the vehicle's front, passenger-side door and both rear doors.

16. In the secondary inspection area, CBPO Jung removed a total of 102 packages from the doors of the Chevrolet Cruze: (1) 10 packages in the front, driver-side door; (2) 10 packages in the rear, driver-side door; (3) 43 in the front, passenger-side door, and

(4) 39 in the rear, passenger-side door. These packages weighed a total of 25.56 kilograms (56.23 pounds) and the substance inside them tested positive for the properties of methamphetamine. CBPO Jung also seized the **Target Device** from the Chevrolet Cruze.

**B.  DEFENDANT'S POST-*MIRANDA* STATEMENT**

17. After being advised of his *Miranda* rights, Defendant elected to waive them and voluntarily answered questions without an attorney present.

18. Defendant claimed he saw an advertisement on Facebook and then met with an individual named Mario regarding a job to transport items from Tijuana, Mexico to Otay Mesa, California. Defendant claimed he met Mario approximately two weeks prior to his arrest and Mario told him he would be paid $2500 to smuggle between ten and twenty-five thousand dollars into the United States. Defendant claimed he did not want to bring drugs or people into the United States, and Mario told him he would be bringing money.

19. Defendant said he met Jorge, Mario's son, at a clinic in Tijuana, Mexico the morning before his arrest. Defendant said his wife was getting surgery at the clinic. Defendant said he gave Jorge the keys to the Chevrolet Cruze and Jorge returned it to the clinic about an hour later. Defendant said he took the Chevrolet Cruze from the clinic and drove his wife home and then went to cross into the United States. Defendant said he expected to deliver the Chevrolet Cruze to a Jack in the Box in Riverside, California and was supposed to call to get the address after he successfully crossed the border. He expected to be paid once he returned to Tijuana, Mexico.

**C.  DEFENDANT'S BORDER CROSSING HISTORY**

20. Defendant drove the Chevrolet Cruze north from Mexico into United States on four separate occasions in the week leading up to his arrest. On January 17, 18, and 19, he drove the Chevrolet Cruze into the United States between 5:00 and 7:00 p.m., and then drove it back into Mexico four to five hours later. On January 22, he drove the Chevrolet Cruze into the United States at 1:28 p.m., and then back south to Mexico at around 2:27 p.m., less than one hour later. Defendant had the vehicle registration for the Chevrolet Cruze at the time of his arrest. This document lists a *fecha de expedición* (date of issue) of

January 17, 2019, the date Defendant first crossed the Chevrolet Cruze into the United States.

21. In the months leading up to his arrest, Defendant had crossed the border in a series of different vehicles. On November 15, December 19 and 20, 2018, he crossed the border in a car bearing California license plate 57345G2; on December 7, 2018, he crossed the border in a car bearing Mexican license plate CWE3166; on November 9, 2018, he crossed the border in a car bearing Mexican license plate AG2468A; and on September 3 and 16, and October 1 and 16, 2018, he crossed the border in a car bearing Mexican license plate ALK3576. Record checks indicate Defendant had only crossed the border twice on foot before August 1, 2018 (on April 28 and June 7), but crossed the border nineteen times both on foot and in five different cars between August 1, 2018 and January 23, 2019.

22. Based on my experience investigating narcotics smugglers, Defendant may have used the **Target Device** to coordinate with the other parties involved regarding the importation of methamphetamine. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the **Target Device**. This data may include information that is relevant to Defendant's narcotics trafficking activities, including identifying other persons involved in their narcotics trafficking activities.

23. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. All parties involved communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States.

24. In this case, evidence supports probable cause to search the **Target Device** for information dating back to August 1, 2018. Therefore, the date range for the search of the **Target Device** should be from August 1, 2018 to January 23, 2019.

//
//

8

## III

## METHODOLOGY

25. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

26. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

27. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual

review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## IV

## CONCLUSION

28. Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause to conclude that Defendant utilized the **Target Device** to facilitate the commission of the Target Offenses.

29. Given the change in Defendant's border crossing history after August 1, 2018, probable cause exists to believe that evidence of the aforementioned offenses exists on the **Target Device** for the period of August 1, 2018 to January 23, 2019.

30. Because the **Target Device** were promptly seized during the investigation of Defendant's drug trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activity committed by the Defendants continues to exist on the **Target Device**.

//
//
//
//
//
//
//
//
//
//
//
//

31. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachment B (incorporated herein) are likely to be found in the property to be searched described in Attachment A (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachment A, and seize the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Ryan A. Hill
Homeland Security Investigations

Sworn to and subscribed before me this 22d day of March, 2019.

_____
HONORABLE NITA L. STORMES
UNITED STATES MAGISTRATE JUDGE

11